Argued and submitted June 7, affirmed in part, reversed in part and remanded
September 18, reconsideration denied December 6, 1985, petition for review denied
March 25, 1986 (300 Or 704)

## 1000 FRIENDS OF OREGON,
*Petitioner,*

*v.*

## LAND CONSERVATION AND DEVELOPMENT
## COMMISSION et al,
*Respondents.*

## (84-ACK-133; CA A33439)

706 P2d 987

Richard P. Benner, Portland, argued the cause and filed the brief for petitioner.

Jeffrey Bennett, Assistant Attorney General, Salem, argued the cause for respondent Land Conservation and Development Commission. With him on the brief were Dave

Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

John K. Knight, Coos County Counsel, Coos Bay, filed the brief for respondent Coos County.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Petitioner 1000 Friends of Oregon (1000 Friends) seeks judicial review of the acknowledgment by respondent Land Conservation and Development Commission (LCDC) of the Coos Bay Estuary Management Plan (the Plan) adopted by respondent Coos County and by the cities of Coos Bay and North Bend.[1] 1000 Friends attacks only certain portions of the Plan, all of which concern areas within the county's planning responsibility. Those portions are two exception areas related to a proposed industrial area on North Spit, one exception for a marina in the South Slough, and the provisions for protecting five blue heron rookeries.[2] We affirm as to the exception areas, reverse as to the rookeries and remand for further proceedings.

We look first at the exception areas, all of which were taken under the "needs" criteria formerly found in Goal 2. In August and December, 1983, after the county and cities first submitted the Plan but before LCDC acknowledged the county's portion, the "needs" criteria were replaced. The comparable criteria are now generally called "reasons." We must first determine whether we should review LCDC's actions on the basis of the former "needs" or the current "reasons" criteria.

The change occurred after LCDC denied acknowledgment as to the county by a continuance order on May 4, 1983. The former "needs" criteria were found in *former* Goal 2, Part II (*amended* December 30, 1983) and *former* OAR 660-04-020 (*amended* December 30, 1983). The change came through the 1983 legislature's adoption of new criteria for exceptions, effective August 9, 1983. Or Laws 1983, ch 827, § 19a (*codified as* ORS 197.732). The legislature also required LCDC to modify the goals and related rules by January 1, 1984, to conform to the legislative changes. Or Laws 1983, ch 827, §

---

[1] The Estuary Management Plan is a cooperative effort of all the affected governmental units and is distinct from the comprehensive plan for Coos County or any of the cities which front on the estuary. The management plan treats the estuary as a naturally created unit rather than dividing it up according to political boundaries. The comprehensive plans apply to the upland areas removed from estuarine influences.

[2] 1000 Friends agrees that the majority of the plan merits acknowledgment.

19b.[3] LCDC· did so on December 30, 1983. OAR 660-04-020; *former* OAR 660-04-022 (*amended* February 10, 1984, March 21, 1984). All of these changes occurred before the county resubmitted the plan to LCDC on March 15, 1984.

The county argues that the modifications to Goal 2 and the new exceptions rules do not apply to this plan because of Or Laws 1983, ch 827, § 15, which provides:

> "Unless a local government so chooses, a local government need not comply with a new or amended goal or rule adopted under a goal until after the comprehensive plan and land use regulations of the local government are acknowledged under ORS 197.251, if the new or amended goal or rule was adopted after January 1, 1983, but before January 1, 1985."

Because the criteria for "reasons" exceptions are partly found in Goal 2 and the related rules, the county argues that it may decline to follow those criteria in taking the exceptions at issue here. The county's argument, if correct, would mean that LCDC would have to apply the new criteria as a statute but could not apply them as a goal and could not use its own rules, adopted at the legislature's direction, to interpret the statutory criteria. That situation would make little sense, and the legislature did not require it.

The amendment to Goal 2 simply tracks the criteria in ORS 197.732(1), so that the new rules are as much implementations of the statute as of the amended goal. The legislature specifically provided in section 19b that the new statutory criteria should apply immediately to all unacknowledged exceptions. The county does not suggest how LCDC could comply with these legislative directives without applying amended Goal 2 and the new rules. The county also fails to note that, under its construction of section 15, the new exceptions criteria could never apply to original acknowledgment proceedings unless the local government decided to apply them.

---

[3] Or Laws 1983, ch 827, § 19b provides:

"The commission shall amend the goals and other rules, as necessary, to make them consistent with the provisions of section 19a of this Act no later than January 1, 1984. To the extent existing goals or rules are consistent with section 19a of this Act, they remain in effect unless revised or repealed by the commission. On and after the effective date of this Act, an exception shall only be taken according to section 19a of this Act, notwithstanding any existing provisions of the goals or other rules governing exceptions to the goals."

There is a simple explanation of the dilemma which section 15 appears to create. Chapter 827 revised a number of aspects of the state's land use laws. The statute focused primarily on post-acknowledgment review; modifying the exceptions criteria was a relatively incidental aspect of the overall act. The purpose of section 15 was not to affect the changes in the exceptions criteria but to limit substantive goal amendments so that they will apply only to post-acknowledgment plan amendments. The purpose to the limitation was to avoid requiring local governments to start the planning process over as a result of goal amendments. They could still apply the new goals if they desired to do so. Section 15 thus relates to the substantive goals, not to the criteria by which a local government justifies a decision not to comply with those goals.

■　　　The legislature did not intend that the exceptions process be frozen along with the substantive requirements of the other goals. In section 19b it expressly provided that the new exceptions criteria shall apply to all plans which were not acknowledged when the new criteria went into effect. By ordering LCDC to amend its goals and rules by a certain date, the legislature also made clear that the new criteria include the new goals and rules. We therefore hold, in accordance with section 19b, that all exceptions taken after August 9, 1983, are to be evaluated by the criteria established in amended Goal 2 and in the amended exceptions rules. We now consider the challenged exceptions.

1000 Friends first attacks LCDC's approval of exceptions from Goals 16 and 17 for a proposed industrial development on North Spit, across the estuary from the urban areas of North Bend and Coos Bay.[4] The shoreline at this point is close to the deep draft channel in the estuary. The county anticipates developing both the adjacent estuary and the upland for a number of water-dependent and water-related industrial uses. The plan also provides for part of the upland away from the estuary to be available for non-water dependent and non-water related uses. The total upland area involved is

---

[4] This development involves two exception areas. Exception 1 covers the estuary and exception 18 covers the adjacent uplands. Exception 1 requires an exception from Goal 16, Estuarine Resources, and exception 18 requires an exception from Goal 17, Coastal Shorelands.

over 500 acres, approximately 90 of which are part of a freshwater marsh on the deflation plain behind the first line of dunes.[5] The Plan calls for those 90 acres to be filled for industrial uses. The area also includes 73 acres of a lagoon which is currently used by an adjoining pulp and paper plant as a waste settling pond. The county believes that that much of the lagoon will be available for fill within the 20-year planning period.

The exception for the estuary extends from the current shoreline to the edge of the deep draft channel.[6] The Plan contemplates building a 2,000 foot long bulkhead some distance into the estuary toward the deep draft channel and filling about 18 acres of productive marine habitat behind the bulkhead to connect it with the current upland. The fill material will come from dredging the channel from its present location up to the bulkhead.

1000 Friends' objections to these exceptions center on filling the 90 acres of freshwater marsh and using bulkhead and backfill rather than a pier built on piles to reach the deep draft channel. 1000 Friends finds various faults with the proposals. Concerning the marsh, it argues that the upland portion can be redesigned to avoid using the marsh, that the

---

[5] The county originally designated 180 acres of marsh for development. It reduced the amount to 90 acres after LCDC rejected its first submission.

[6] The statutory requirements for a "reasons" exception are in ORS 197.732(1)(c), which provides:

"A local government may adopt an exception to a goal when:

"* * * * *

"(c)   The following standards are met:

"(A)   Reasons justify why the state policy embodied in the applicable goals should not apply;

"(B)   Areas which do not require a new exception cannot reasonably accommodate the use;

"(C)   The long term environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and

"(D)   The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."

exception does not comply with the minimization requirements of OAR 660-04-022(7)(b)(C)[7], that LCDC failed to consider alternative areas as ORS 197.732(1)(c)(B) requires and that an exception on coastal shorelands for non-water dependent uses violates Goal 17. It urges that the exception for the estuary is improper because it allows a bulkhead and fill for potentially non-water dependent uses and because the county and LCDC failed to consider the alternative of a multipurpose dock built on pilings.[8] Evaluating these objections requires a closer look at the purpose of the proposed marine industrial park. We turn to that subject.

The Coos Bay area's economy has traditionally been heavily dependent on lumber production, logging and lumber shipping and, as a result, it has been especially hard hit by the

---

[7] OAR 660-04-022(7)(b) provides:

"To allow a use which is incompatible with Goal 17 requirements for coastal shoreland areas listed in subsection (7)(a) of this rule the exception must demonstrate:

"(A) A need, based on the factors in Goal 9, for additional land to accommodate the proposed use,

"(B) Why the proposed use or activity needs to be located on the protected site considering the unique characteristics of the use or the site which require use of the protected site, and

"(C) That the project cannot be reduced in size or redesigned to be consistent with protection of the site and where applicable consistent with the protection of natural values."

[8] The relevant rule is OAR 660-04-022(5), which provides:

"Goal 16 --- Water Dependent Development: To allow water-dependent industrial, commercial, or recreational uses in development and conservation estuaries which require an exception an economic analysis must show that there is a reasonable probability that the proposed use will locate in the planning area during the planning period considering the following:

"(a) Factors of Goal 9 or for recreational uses the factors of Goal 8;

"(b) The generally predicted level of market demand for the proposed use;

"(c) The siting and operational requirements of the proposed use including land needs, and as applicable, moorage, water frontage, draft, or similar requirements; and

"(d) Whether the site and surrounding area are able to provide for the siting and operational requirements of the proposed use;

"(e) The economic analysis must be based on Goal 9 element [sic] of the County Comprehensive Plan and consider and respond to all economic needs information available or supplied to the jurisdiction. The scope of this analysis will depend on the type of use proposed, the regional extent of the market and the ability of other areas to provide for the proposed use."

recession in the wood products industry. Governments in the area have therefore directed a significant part of their planning efforts toward economic diversification. The North Spit area proposed for these exceptions is the best location for significant industrial development in the region. It would take full advantage of Coos Bay's natural locational advantages. Because of the significant interference with the use of the area's natural resources which industrial development necessarily involves, the location cannot, consistently with Goals 16 and 17, be used for industrial purposes. In order to justify an exception to Goal 16 for the estuarine segment, the county must show the nature of the proposed use and "that there is a reasonable probability that the proposed use will locate in the planning area during the planning period * * *." OAR 660-04-022(5). 1000 Friends asserts that the county has failed to show a sufficient probability that the uses it identifies will, in fact, locate in the area during the planning period.

The county has identified a number of possible industrial uses which it believes may locate in the area within the planning period. They include a coal export port, oil and gas processing and the processing of deep sea manganese nodules or of polymetallic sulfides from the offshore Gorda Ridge. 1000 Friends points out that there are doubts about the likelihood of any one of these industries locating in Coos Bay and that the county's own estimates show that it is highly unlikely that all of them will.

■■■ 1000 Friends' argument misunderstands the county's burden. The rule does not require the county to show a reasonable probability that *specific industries* will locate in the area within the planning period, but only that the *proposed use* will do so. The "proposed use" for the industrial park is industry in general, not one or more specific industries. LCDC could properly decide on this record that the county has shown that some significant industries will locate in the exceptions area within the 20-year planning period, although it could not yet name which specific industries from the list of possibilities. In the light of the Coos Bay region's needs and the inevitable uncertainties of planning for new industries, some of which do not presently exist anywhere, that showing is sufficient to comply with the rule. The specific acreages allotted to different proposed industrial uses must be seen as

guidelines, giving the county continuing flexibility to adapt the site to specific needs as they arise.[9]

■　An exception to Goal 16 for industrial development also requires that the anticipated use be water dependent. The county anticipates that some of the industry on the upland portions of the site will not be water dependent. 1000 Friends argues that, as a result, the Goal 16 exception is improper. 1000 Friends confuses the two exceptions involved. The exception to Goal 16 is only for the estuary, including the planned bulkhead and fill. The only portion of the future industrial area which must meet the Goal 16 exceptions requirement is that portion which is presently "in" the estuary and which will eventually be filled to make it part of the area. In fact, the plan provides for water dependent industries on the upland site next to the estuary so that those industries may use the access to the deep draft channel which the Goal 16 exception—both that portion which will be filled and that which will not—provides. All uses of areas currently part of the present estuary will be water dependent. That there may also be non-water dependent or non-water related uses on portions of the present upland away from the estuary does not affect the requirement that the bulkhead and fill be for water dependent uses. Indeed, the water dependent and non-dependent uses could be complimentary, with the availability of space for both making the development of each more likely.[10]

■　Finally, 1000 Friends argues that LCDC erred by approving the bulkhead and fill in the estuary because the upland alternative of a dock built on piers is available, albeit at a higher cost. Such a dock would have a significantly lower

---

[9] An analysis prepared by the Economic Development Department and included with the county's submissions to LCDC states:

"The likelihood of any one or combination of these industries locating on the North Spit can only be estimated at this point. A variety of economic factors will guide those choices over the next 20 years. The only certainty is that by making this unique area available for development, Coos County will be opening itself up for a variety of incipient and potentially prosperous industrial options, any of which would diversify and strengthen the county's economy, and consequently, that of the state."

[10] For instance, if polymetalic sulfides are mined from the Gorda Ridge and brought to Coos Bay for transshipment, the landing, storing, and shipping of them would be water dependent uses. A nearby processing plant would be related to the water dependent use but would not itself be water dependent or water related. Only those uses of upland which were water dependent would use the bulkhead and fill.

impact on the estuary's natural resources than would a bulkhead and fill. 1000 Friends asserts that LCDC violated the Goal 16 requirement that there be no upland alternatives before a fill is permissible. This argument also miscontrues the issue. The question is not whether the bulkhead and fill comply with Goal 16, for they do not; that is the reason that the county had to take an exception for them. The question, rather, is whether they are a proper exception to the goal's requirements, which necessarily includes the question of whether they are a proper exception to the requirement that no upland alternative exist. The alternative of a multi-purpose dock is relevant in this context only in examining the long term effects of the bulkhead and fill, after planned mitigation for its adverse consequences on the resource. ORS 197.732(1)(c)(C). There is substantial evidence in the record supporting the county's and LCDC's finding that the consequences of the bulkhead and dock are not so adverse as to prevent an exception. ORS 197.732(6)(a). LCDC did not err in acknowledging the estuarine exception.

■       The upland portion of the site requires an exception to Goal 17. LCDC appropriately found that the county had satisfied the requirements for that exception. As we have already shown, there is a need for the industrial development on this site. 1000 Friends primarily criticizes the filling of the marsh land. However, because of the configuration of the land, the marsh land is necessary in order to extend rail access to the parts of the area which will undergo industrial development. Any alternative route would cause congestion, because trains would block the access road and would interfere with loading and unloading ships. The project cannot be redesigned to avoid this problem. 1000 Friends suggests using more of the waste lagoon as an alternative. However, most of the waste lagoon will not be available until some time in the indefinite future; there is substantial evidence to support the county's finding that only 73 acres of the lagoon will be available during the planning period. Although the anticipated use of the portions of the upland for non-water related purposes may violate Goal 17, the issue before us is whether an exception to the requirements of that goal is appropriate. We must decide that issue on the basis of the statutory and other requirements for an exception; if they are met, the goal requirements are irrelevant. LCDC has found that the county has met the

requirements for a "reasons" exception as to the upland area, and we cannot say as a matter of law that LCDC is wrong.

1000 Friends next challenges an exception which would allow the construction of a marina at Indian Point in the South Slough area. The estuary at that point presently includes a highly productive intertidal and subtidal region. It is the source of food for many marine organisms, and water fowl use it extensively for breeding and nesting. Construction of the marina would destroy most of this resource, although the loss can be mitigated by modifying the shoreline at other points in the estuary. The county's comprehensive plan[11] provides for a major resort on the upland adjacent to the proposed marina. The marina is a part of that overall resort development. Because of the adverse environmental effects, the marina would violate Goal 16. The county has therefore taken an exception to provide for it as part of the estuary plan under review. It has also taken an exception in its comprehensive plan from the other resource goals for the upland portion of the resort.

The exception for the marina is a "reasons" exception governed by ORS 197.732(1)(c)(A), as explicated in OAR 660-04-022(5). 1000 Friends asserts that the reasons stated for the exception are inadequate, because LCDC did not find that there is a reasonable probability that the proposed use will locate in the area within the plan period. 1000 Friends discusses and criticizes the evidence supporting the county's determination of the amount of moorage space which will be needed throughout the estuary within that period and suggests various upland alternatives to the marina. These arguments again miss the point. LCDC and the county justify the Indian Point marina as a part of a larger development. A possible surplus of moorage space elsewhere in the estuary, or the existence of dry land storage on trailers combined with a greater availability of boat ramps, would not affect the reasons justifying this specific marina.

■ The real issue concerning this exception is whether the proposed Indian Point resort above the marina is a proper use of the uplands; if it is, there are adequate reasons for the

---

[11] As previously noted in n 1, the county's comprehensive plan is distinct from the Estuary Management Plan which we review in this case.

marina and there is a reasonable probability that it will locate in the exception area within the planning period. The county has taken the upland portion of Indian Point as a committed exception in its comprehensive plan. LCDC, in reviewing that plan found that a committed exception *might* be appropriate; it has asked the county for further information before finally determining whether to approve the exception. ORS 197.732(1)(b). In approving the Indian Point marina as part of the estuary plan, LCDC relied on its findings in its review of the comprehensive plan concerning the upland exception. If LCDC ultimately acknowledges the upland exception as part of its review of the comprehensive plan, the exception included in the estuary plan for the marina will be proper; if it does not, that exception will be irrelevant because of the direct tie between the projects. The crucial question is thus the upland exception, and that issue is not before us in this case. So far as this record shows, LCDC did not err in acknowledging the Indian Point marina exception as part of the estuary plan.

The final issue is whether the county in its treatment of five heron rookeries adequately followed the requirements of Goal 17 that it protect natural resources in the coastal shorelands.[12] The rookeries are located within coastal forest areas which Goal 17 requires be used consistently with their natural values and with only selective harvesting of timber. Heron rookeries require buffers, or the birds will abandon them; it is not consistent with the protection of a rookery to log all trees except those in which there actually are nests. In spite of this fact, the Plan does not put the rookeries into a special zone or place special limits on logging near them. Instead, the county's Plan Policy 34a, suggested by the Department of Forestry, requires that Department to enforce the Forest Practices Act and related rules "in such a manner as to protect the natural values of the major marshes and significant wildlife habitat areas, and to maintain riparian vegetation." LCDC acknowledged the Plan on the basis of its belief that the county had the legal authority to instruct the Department as to how to carry out its responsibilities in this

---

[12] 1000 Friends also asserts that the county violated Goal 5 in this respect. We think it sufficient to hold, as we do *infra*, that Goal 17—whose specific concern is such a natural resource—is violated.

respect. There is no suggestion that, in the absence of the county's specific direction on the Plan, the FPA will automatically protect the rookeries. If LCDC's legal position is incorrect, Goal 17 applies, protection for the rookeries under the Plan is inadequate and the Plan violates Goal 17.[13]

ORS 527.722(1) provides in pertinent part:

"[N]o unit of local government shall adopt any rules, regulations or ordinances regulating the conduct on forest lands of forest operations governed by the Oregon Forest Practices Act or rules promulgated thereunder."

This prohibition is limited by ORS 527.726(1):

"Nothing in ORS 527.722 and 527.724 is intended to preclude counties from performing their planning duties pursuant to ORS 197.005 to 197.430 and 197.610 to 197.850 with respect to forested lands by:

"(a)  Designating in comprehensive plans forested lands to be conserved in accordance with the state-wide planning goals;

"(b)  Zoning forested land for uses other than or complementary to commercial growing and harvesting of forest tree species in implementing a comprehensive plan; or

"(c)  Adopting rules, regulations or ordinances regulating forest operations on those forested lands zoned for primary uses other than the commercial growing and harvesting of forest tree species in accordance with the use or purpose for which those lands have been zoned."

ORS 197.180(1) requires state agencies to act in compliance with acknowledged comprehensive plans. LCDC argues that these statutes make Policy 34a binding on the Department of Forestry, despite the language of ORS 572.722(1). We are not persuaded.

■.  The plan does not designate forested lands to be conserved in accordance with the goals, the county has not zoned forested lands for uses other than or complementary to commercial growing and harvesting of forest trees and the county has not adopted rules regulating forest operations on

---

[13] We note that Policy 34a is so vague that it may not provide enforceable guidance to the Department of Forestry. Because of our holding that the county lacks authority to direct the Department's actions in this respect, we need not decide whether the policy is sufficient to comply with the county's obligation to protect these resources.

forested lands zoned for other than commercial forest uses. So far as we can determine, the county has not planned or zoned the rookeries, as rookeries, at all. The county, therefore, did not apply ORS 527.726(1).

ORS 197.180(1) provides:

"Except as provided in ORS 527.722, state agencies shall carry out their planning duties, powers and responsibilities and take actions that are authorized by law with respect to programs affecting land use:

"(a)    In compliance with goals adopted or amended pursuant to ORS 197.005 to 197.430 and 197.610 to 197.850; and

"(b)    Except when a finding is made under ORS 197.640(3)(c), in a manner compatible with:

"(A)    Comprehensive plans and land use regulations initially acknowledged under ORS 197.251; and

"(B)    Amendments to acknowledged comprehensive plans or land use regulations or new land use regulations acknowledged under ORS 197.625."

This statute does not justify *the county,* in the Plan, instructing the Department how to carry out its responsibilities. The issue is, what has the county done to meet *its* responsibilities? Its only answer is Policy 34a; but, to the extent that Policy 34a is sufficiently specific to be enforceable, it simply shifts the county's responsibilities under Goal 17 to the Department. That is not performance of the county's responsibilities; it is abdication of them. The Plan itself does not provide the required protection, as it could, for instance, by appropriate planning and overlay zoning of specific rookery areas. *See* Thatcher and Duhnkrack, "Goal Five: The Orphan Child of Oregon Land Use Planning," 14 Envir Law 713, 741-42 (1984).[14] The Plan violates Goal 17, and LCDC erred in acknowledging this part of the Plan.

Affirmed in part; reversed in part and remanded for further proceedings to apply Goal 17 to heron rookeries.

---

[14] We express no opinion on the Attorney General's view of county powers under ORS 527.722 as described in the Thatcher and Duhnkrack article. We simply hold that the county has not, in this Plan, complied with Goal 17 or shown that it is powerless to do so.